IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SANDY SCOGGINS,<br><br>  *Plaintiff,*<br><br>v.<br><br>TERRY JOEL DUBROW, M.D., Individually,<br>TERRY DUBROW, M.D., A MEDICAL<br>CORPORATION, JACQUELINE BRAMBILA,<br>ROX SURGERY CENTER<br>NEWPORT BEACH, LLC, and<br>E! ENTERTAINMENT TELEVISION, LLC<br><br>  *Defendants*. | Civil Action: _____<br><br>**Jury Trial Demanded** |

## COMPLAINT

TO THE HONORABLE UNITED STATES JUDGE:

    COMES NOW, Plaintiff Sandy Scoggins, complaining of Defendants Terry Joel Dubrow, M.D., Terry Dubrow, M.D., a Medical Corporation, Jacqueline Brambilla, Rox Surgery Center Newport Beach, LLC, and E! Entertainment Television, LLC, and each of them, would respectfully state as follows:

### I.    THE PARTIES

    1.    Plaintiff Sandy Scoggins ("Plaintiff" or "Scoggins") is a natural person, who is, and all times relevant to this claim was, a resident of the Southern District of Texas.

    2.    Defendant Terry Joel Dubrow., M.D. ("Dubrow"), is a natural person who is a resident of the City of Newport Beach, Orange County, California. He may be served with process at his place of business located at <u>1617 Westcliff Drive, Suite 207, Newport Beach, California 92660, or wherever he may be found</u>.

3. Defendant Terry Dubrow, M.D., a Medical Corporation ("Dubrow's Office"), is a California Corporation that does business and maintains its principal place of business in Newport Beach, Orange County, California. It may be served with process by serving its Agent for Service, Victoria Therrien, at: <u>1617 Westcliff Drive, Suite 207, Newport Beach, California, 92660, or wherever she may be found</u>.

4. Defendant Jacqueline Brambilla is a natural person who is a resident of the City of Fresno, Fresno, California. She may be served by serving her at her place of business located at: <u>1617 Westcliff Drive, Suite 207, Newport Beach, California 92660, or wherever she may be found</u>.

5. Defendant Rox Surgery Center Newport Beach, LLC ("Rox") is a California Limited Liability Company with its principal place of business in Orange County, California. It may be served by serving its Agent for Service, Arthur Barens at: <u>1617 Westcliff Drive, Suite 106, Newport Beach, California 92660, or wherever he may be found</u>.

6. E! Entertainment Television, LLC ("E! Entertainment") is a Delaware Corporation with its principal place of business in Los Angeles, California. It may be served by serving its Registered Agent, Enterprise Corporate Services, LLC, located at <u>1201 N. Market Street, Suite 1000, Wilmington, Delaware, 19801</u>.

## II. JURISDICTION AND VENUE

7. Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of Texas. Defendants are citizens of California and Delaware. Therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00. Plaintiff alleges the damages in this case are $10,000,000.00.

8. Venue in the Southern District of Texas is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions on which the claims asserted herein are based or occurred in this District.

### III. FACTS

9. Whenever in this Complaint it is alleged that a Defendant did or was told any act or thing, it is meant that said Defendant's officers, agents, servants, employees, or representatives may have done or been told such act or thing and that, at the time such act or thing was done, it was done with the full authorization or ratification of the Defendant or was done in the normal and routine course and scope of employment of the Defendant's officers, agents, servants, employees, or representatives.

10. Dubrow represents himself as a renowned plastic surgeon who can do what other plastic surgeons cannot. He is the star of E! Entertainment's hit television show, "Botched"—a show where, ironically, patients with botched plastic surgery procedures seek his services to correct failed surgeries done by other plastic surgeons. The surgeries are aired on television by E! Entertainment and viewed worldwide.

11. Scoggins, an individual who used to be healthy, active, and self-supporting, has struggled with her legs' appearance for her entire life. She has not worn shorts in public for over twenty years due to loose skin and cellulite on her legs.

12. Scoggins decided that she wanted to get plastic surgery to remedy her concerns with her legs' appearance. One of her plastic surgeons in Texas informed her that she would need an upper thigh lift, which would require an incision from her inner groin extending towards her inner knee.

13. Scoggins did not want a scar of that magnitude and was advised by her Texas doctor that the procedure was not recommended, so she decided to schedule an appointment with Dubrow—the doctor that can "do the impossible."

14. After years of watching *Botched* and admiring Dubrow's work, Scoggins was confident that Dubrow could perform her surgery and give her the same jaw-dropping results advertised on the show. On April 15, 2019, Scoggins called Dubrow's office to schedule a consultation for the upper thigh lift, liposuction to her legs, and a scar revision on her lower back.

15. Scoggins paid the consult fee of $365.00, and the initial consultation was confirmed for June 10, 2019. At this point, Scoggins was happy at the expectation of being treated by "the best."

16. On June 10, 2019, Scoggins met with Dubrow. Despite both *Botched* and Dubrow's website claimimg that each procedure is preceded by "hours of extended consultation with Dubrow," he was only in the room with Scoggins for thirty (30) minutes before he passed her off to someone else for scheduling and payment.

17. Dubrow convinced Scoggins that he could produce stunning results that would look unbelievable when comparing before-and-after photos. When she informed Dubrow of her Texas doctor's concerns, he dismissed them after showing her in the mirror that he would do it the right way and explaining that he is "no stranger to complicated cases," and that is how he built his career. Dubrow lulled Scoggins into deciding to proceed with his services.

18. According to Dubrow, he regularly performs extraordinarily tricky surgeries, and he could improve Scoggins's look by 85%.

19. Scoggins was excited about her promised new look and thrilled at the thought of finally being comfortable with her lower body in public.

20. Scoggins's pre-op appointment was on July 29, 2019, and most of that time was spent with Dubrow's P.A., Brambilla. Dubrow was present for only 20 minutes of this pre-op appointment. During that visit, Dubrow stated to Scoggins, "I drove home last night thinking about how I am going to do your surgery." Scoggin's surgery was the next day, July 30, 2019—and Scoggins had no idea this would be the beginning of a living nightmare.

21. It is important to note that Scoggins had multiple plastic surgeries with her plastic surgeon in Texas, both before and after her surgery with Dubrow, all of which were wholly uneventful and resulted in no infections, no incision lines opening up, or any other complications.

22. Scoggin's surgery with Dubrow took place on July 30, 2019. The surgery consisted of inner and outer thigh lifts. Scoggins planned to have Brachioplasty as well, but Dubrow had to record *Botched*, and his schedule did not have time for that procedure to be performed.

23. Following Scoggins's surgery, while in the recovery room, E! Entertainment agents and employees entered with lights and cameras and scolded Scoggins to "be quiet" because they were filming. Scoggins did not consent for non-medical personnel to be in the room with her, especially not a *Botched* crew with cameras.

24. While Scoggins was in recovery, just moments after Dubrow left to start filming with *Botched*, the nurses attempted to assist Scoggins to sit up in her bed, and she felt a horrible stinging sensation on her back. Right above her buttocks, in the center of her back, her incision dehisced. According to the nurse, Scoggins's incision line busted open six (6) inches as a result of Scoggins merely sitting up.

25. This is something that has never happened to Scoggins ever—both pre- and post-Dubrow. The fact that she dehisced in recovery by only sitting up at a 45-degree angle was indicative of a lousy and rushed suture job by Dubrow.

26. Nurses then opened the recovery room door and whispered to the *Botched* film crew (not medical personnel) that, "We need Dubrow" and explained that Scoggins dehisced. The film crew told the nurses that "you're going to have to wait until a stopping point." Scoggins then waited for approximately 10 minutes until Dubrow reached a "stopping point" to attend to her.

27. Dubrow entered the recovery room looking panicked and instructed the nurses to get a suture kit and other items. Dubrow then hurriedly stitched Scoggins up at bedside as he had to continue to administer local anesthesia (without waiting to ensure numbness), which was not working. Scoggins could feel the needle, the pull, the threading—and when he noticed Scoggins discomfort, Dubrow exclaimed, "Oh, you can feel that?"

28. Dubrow apologized for not being able to administer anything other than local anesthesia or being able to take Scoggins back to the Operating Room because *Botched* was filming. Dubrow was very rushed and stated he would normally take Scoggins back to surgery, but "he's filming" and they were "waiting on him." Instead of concentrating on fixing the initially rushed suture job, Dubrow rushed again so he could get back to filming his show.

29. Dubrow stated, "I'm going to put in extra safety sutures, so this *should* hold." He then patted her on the arm, said, "you are a trooper," and proceeded to ask for advice on his family relations regarding a shopping trip with his wife and daughter. Dubrow then left the room, and Scoggins fainted. Since this point, Dubrow only saw Scoggins one time for 10-minutes on August 6, 2019.

30. Dubrow never discussed aftercare in Texas. Dubrow pre-scheduled aftercare in California. Scoggins booked her flight for the aftercare, but she was battling for her life in a Texas hospital when she was supposed to return to California.

31. Dubrow's rushed and negligent work became even more apparent over the next 7 days when 5 large sections of her incision line opened up and required her immediate hospitalization.



32. Scoggins hired an aftercare nurse to assist her for 72 hours after the surgery with Dubrow. Scoggins's sister also helped with Scoggin's recovery. The tension in Scoggin's inner groin was so tight she could barely spread her legs. Scoggins had to keep her legs together at all times, especially when getting in and out of the car. The evening following surgery, Scoggins began running ran a low-grade fever, and it continued every night after that.

33. On August 2, 2019, Scoggins started to develop some swelling in her lower abdomen. She went into Dubrow's office, and Brambilla aspirated off some fluid from Scoggins's wounds. Brambilla attempted to get Scoggins scheduled with a radiologist to have a drain placed, but there was no availability until the following Monday, August, 5, 2019. Brambilla was extremely sick while with Scoggins.

34. On two different occasions, Brambilla instructed Scoggins and her sister, "Whatever you do, don't go to the E.R. If they see this, all they will do is freak out."

35. On August 3, 2019, Brambilla made the unusual accommodation in coming to work on a Saturday in order to drain off more fluid from Scoggins's abdomen. Brambilla could not do this effectively by herself so she asked, Kim Austin, a patient coordinator that works at Dubrow's Office, to assist with this procedure. Kim Austin was wearing workout clothes and had just come from working out.

36. Dubrow was relentlessly calling Brambilla to discuss a business deal. Brambilla discussed Scoggin's issues and told Dubrow that she (Brambilla) was running a fever with a high pulse. Dubrow, unconcerned, continued his conversation regarding the business deal. He told Brambilla he needed to talk about a business venture where they can make "a lot of [expletive] money." Brambilla kept informing Dubrow that she was busy with Scoggins and would call back, but Dubrow kept talking about how much money they could make and that he needed to know if Brambilla was "in."

37. Dubrow ignored the fact that his Brambilla was in the middle of aspirating off fluid from Scoggins and continued the conversation about "how much [expletive] money they could make." Despite Brambilla stating to Dubrow, "I can't do this and talk to you," Dubrow kept

talking.

38. On August 5, 2019, still in California, Scoggins went to Hoag Hospital in the early afternoon for a scheduled outpatient appointment for a drain to be placed. The drain was placed in Scoggins's lower right abdomen. The Radiologist sent the fluid collected during the procedure to the lab to be cultured and to see if any infection was present.

39. The Radiologist instructed Scoggins if she developed any fever to go to the emergency room.

40. Based on medical records, the fluid that was sent for culture on August 5, 2019 did grow a bacterium that required immediate medical attention—Enterococcus faecalis. Vancomycin was necessary to treat the infection. This is not a bacterium that should be ignored in a post-op surgical patient. The bacteria started growing on August 5, 2019, and the final result was entered on August 8, 2019.

41. Dr. Dubrow was the ordering physician for the culture of the fluid removed from Scoggins. This report from the culture was sent to Dubrow as the ordering physician. *To date, Scoggins has never received a call, text, letter, or any other form of communication regarding this deadly bacterium growing in her body from Dubrow, Dubrow's Office, or Rox.*

42. Had this infection been caught and treated when it should have, Scoggins would not have ended up going septic on two separate occasions or have had five sections of her incision line bust open. The hospital and Dubrow had a duty to notify her of this; they did not.

43. Later that evening, Scoggins fever spiked to 102 degrees, and she felt terrible. Around 10:00 pm, her sister called 911, and E.M.S. arrived and triaged her. They suggested Scoggins go to the hospital to be examined out of fear she was developing sepsis.

44. Scoggins was transported to Hoag ER and assessed via ambulance. She was discharged in the early morning hours around 4:00 am on August 6, 2019. Scoggins's medical records indicate the attending physician paged Dubrow four (4) different times and received no return call.

45. When Scoggins arrived for her scheduled appointment on August 6, 2019, Dubrow and Brambilla stated the attending physician's call would have gone to Brambilla, but she was sleeping and didn't hear any calls. Dubrow cleared Scoggins to fly back to Houston on August 6, 2019, knowing Scoggins had been in the E.R. just hours earlier with a 102-degree fever.

46. On August 7, 2019, Scoggins was lying in bed and attempted to get up to use the restroom when she felt a horrific pain. Scoggins had her sister look to check and make sure everything was okay, and it was not. Scoggins's incision on her lower left groin had burst open.

47. Scoggins contacted her Texas plastic surgeon, and he had Scoggins come to his office to assess her. At that point, the plan was made to pack the wound wet to dry and wait for it to heal.

48. Scoggin's Texas plastic surgeon had performed her previous surgeries, including a tummy tuck, breast lift, neck lift, and a Brachioplasty, all without incident, so she felt most comfortable having him evaluate her following the disaster that was her experience with Dubrow.

49. On August 9, 2019, Scoggins continued to run a fever and had increased amounts of pain. Scoggins noticed other areas along the incision line that appeared to be more infected. Scoggins went to Grace E.R. in Pearland, Texas. The doctor assessed the wounds and prescribed her pain medications.

50. Scoggins then spoke to her Texas plastic surgeon, who prescribed her a cycle of antibiotic treatment. Scoggins was to follow up with her Texas plastic surgeon in his office on Monday, August 12, 2019.

51. On August 11, 2019, fluid began seeping out of the incision on Scoggin's hips and dripping down towards her groin. She immediately phoned her Texas plastic surgeon and informed him that she had some lower abdominal swelling and leaking fluid. Her doctor urged her to go directly to the E.R.

52. The Texas plastic surgeon indicated that if there is fluid building up, he wanted the E.R. to drain that off as it could lead to an infection. Even still, neither the Texas plastic surgeon nor Scoggins had any clue that she was already infected with Enterococcus faecalis even though it was shown by the results from the culture taken at Dubrow's direction on 8/5/19.

53. Shortly after that, Scoggins arrived at the Methodist E.R. in Clearlake, Texas, for what she thought would be a brief visit to drain some fluid off her abdomen and ended up being admitted for 10 days. They immediately started her on sepsis protocol.

54. Scoggins had a fever, low blood pressure, and her wounds were severely infected. Several sections of the incisions were beginning to open up.

55. Underneath her skin, the infection had destroyed a layer of more than 4 inches of her flesh. At this juncture, that this was only *12 days post-op*.

56. Had she received medical attention on August 5, 2019 when the culture started to grow the bacteria, this could have been minimized or avoided altogether. Instead, Scoggins was sent back to Texas, where these bacteria grew rampant in Scoggins' body, resulting in her incisions becoming infected and eventually busting open again.

57. On August 20, 2019, when Scoggins was finally discharged, she was placed on more oral antibiotics and instructed to follow up with the Texas plastic surgeon. Home Health was set up for wound care, and Scoggins continued to follow up with the infectious disease specialist, wound care specialist, and the plastic surgeon.

58. On August 30, 2019, Scoggins spiked another fever; this time to 103.3, and she was experiencing confusion as a result thereof. She was admitted into Methodist Clearlake hospital again for a 7-night stay.

59. On September 2, 2019, Scoggins developed increased drainage from several of her wounds while in the hospital. The surgeon said they needed to go in and do a washout to clean out the bacteria. During this surgery, the *doctor had to remove foreign objects left behind from Dubrow's surgery*. Pathology indicated it was a "tan and white synthetic mesh-like material."

60. The doctor was also able to do a deep wound culture. It came back positive for Escherichia coli and E.S.B.L. According to Scoggins' infectious disease doctor, this is transmitted in the Operating Room when a patient is open. Therefore, aside from the nasty and deadly infection Scoggins was never notified about, foreign objects were also left behind inside her body.

61. The surgeon's operation had to be stopped because the debris from the materials left from Dubrow's surgery was stuck in the tubing. The deadly bacterium, Escherichia coli, was found at the same site as Dubrow's surgery, along with the objects left by Dubrow during the surgery in California.

62. On September 6, 2019, Scoggins was discharged from Methodist Clearlake with a midline for fourteen (14) days of IV meds and daily wound care.

63. Her body still required weeks of healing before she could endure the additional surgeries necessary (so far, 3 in total) to clean/close the wound and revise the scarring left behind.

64. The infectious disease nurse at Methodist asked for the name of the surgery center and the surgeon's name as she was required by law to notify them of the deadly bacteria Scoggins had acquired from their facility.

65. Dubrow's surgery was the only surgery (out of many performed on Scoggins) that resulted in multiple incisions opening up immediately after surgery, deadly infections, and unbearable pain, suffering, and permanent disability that exists to this day. Dubrow nearly took Scoggins's life, so for this reason, Scoggins files this Complaint herein against Dubrow and for all those responsible for her near-death experience.



## **COUNT ONE**

**(Medical Malpractice- As to Dubrow, Dubrow's Office, and Brambilla)**

66. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

67. From on or about July 2019, Scoggins consulted Defendants Dubrow and Brambilla, and each of them, to obtain a diagnosis, care, and treatment in connection with her medical conditions, including but not limited to surgery consisting of inner and outer thigh lifts, and employed said Defendants, and each of them, to examine, diagnose, treat, and care for her for compensation, which she agreed to pay.

68. Defendants, and each of them, undertook individually, and by and through their agents, servants, and employees, to examine, diagnose, treat, prescribe for and care for Scoggins, including but not limited to examining, diagnosing, providing to and prescribing for and administering various drugs and medications and performing certain surgical procedures, diagnostic tests, and said Defendants, and each of them, did evaluate, diagnose, examine, treat, prescribe and care for Scoggins by means of various procedures, including but not limited to evaluating and reading radiological films and scans, physical examinations, and the administration of certain drugs and medications and performing surgical procedures.

69. At all times and places mentioned herein, Defendants, and each of them, carelessly and negligently instructed, evaluated, examined, diagnosed, operated, prescribed for, cared for, and treated Scoggins for her medical conditions, including but not limited to inner and outer thigh lifts, and Defendants, and each of them provided the hospital, medical, nursing, laboratory, radiological, care and services, manufacturing, and pharmaceutical services carelessly and negligently all of which, among other things, directly and proximately resulted in certain permanent injury and disability to Scoggins, including but not limited to, permanent damages.

70. As a direct and proximate result of the acts, omissions, and conduct of Defendants, and each of them, and said injuries caused to Scoggins, Scoggins was required to and did incur expenses for services of hospitals, doctors, and other medical care and treatment in an amount not now known to her, but currently in excess of $300,000.00, and Plaintiff is informed and believes and upon such information and belief alleges that she will incur additional expenses in the future in an amount not now known to her. Plaintiff will ask leave of this Court to set forth the exact amount thereof when the same becomes known to her.

71. As a further direct and proximate result of the acts, omissions, and conduct of Defendants, and each of them, Plaintiff was prevented from attending her usual activities. Plaintiff is informed and believes and upon such information and belief alleges that she will be prevented from attending to her usual activities in the future, all to Plaintiff's damage in an amount not now known to her. The Plaintiff will ask leave of Court to amend her pleadings to set forth the exact amount thereof when the same becomes known to her.

72. As a further direct and proximate result of the acts and omissions of Defendants, and each of them, as set forth more fully herein, Scoggins has suffered and will continue to suffer considerable physical pain, mental and emotional anguish, limitation and restriction of her usual activities, pursuits and pleasures and other general damages.

73. As a further direct and proximate result of the acts and omissions of Defendants, and each of them, as set forth more fully herein, the Plaintiff has been caused to suffer and will continue to suffer substantial loss of earnings and earning capacity.

74. Scoggins prays for damages as a result of the foregoing in the amount of $10,000,000.00.

## COUNT TWO

### (Misrepresentation as to Dubrow)

75. Plaintiff incorporates all foregoing paragraphs as if fully set forth herein.

76. Dubrow made false statements of material fact, including, but not limited to, the following:

   a. that he could produce stunning results that would look unbelievable when comparing before-and-after photos;
   b. that Scoggins need not be concerned about concerns from other plastic surgeons while showing Scoggins in the mirror how she would look like a brand-new person;
   c. that he would perform the surgery "the right way" and explaining that he is "no stranger to complicated cases;" and,
   d. by stating that he "could improve Scoggins's look by 85%."

77. Dubrow made the statements to induce reliance—to convince Scoggins to hire her for a plastic surgery procedure that her usual plastic surgeon declined to undertake.

78. Dubrow knew or reasonably should have known that his statements were false.

79. Scoggins justifiably relied on Dubrow's representations and decided to hire Dubrow for her plastic surgery procedure.

80. As a result, Scoggins suffered compensatory damages, consequential damages, and emotional distress in the amount of $10,000,000.00.

## COUNT THREE

### (Negligent Infliction of Emotional Distress- Direct Victim- As to Dubrow and Brambilla)

81. Plaintiff incorporates all foregoing paragraphs as if fully set forth herein.

82. By virtue of their physician-patient relationship with Scoggins, Defendants owed Scoggins a duty of care, which, as described more fully above, was breached by Defendants and

caused Scoggins damages.

83. Defendants' negligent conduct proximately caused Scoggins severe emotional distress to the level that no reasonable person in a civilized society should be expected to endure.

84. Defendant's negligent infliction of emotional distress upon Scoggins resulted in damages in the amount of $10,000,000.00.

## COUNT FOUR
### (Negligence—Premise Liability as to Rox)

85. Plaintiff incorporates all foregoing paragraphs as if fully set forth herein.

86. Scoggins was also harmed because of the way Rox maintains its property.

87. Rox owns, leases, occupies, or controls the property located at 1617 Westcliff Drive, Suite 106, Newport Beach, California, 92660-5524, a surgery center.

88. Rox was negligent in the use or maintenance of the property because Rox owed a duty to exercise reasonable care to Scoggins, a business invitee, and failed to use reasonable care to discover unsafe conditions and give adequate warning of anything that could be reasonably expected to harm others. Specifically, Rox knew or should have known that dangerous and infectious bacteria could be present in Rox's operating room. Infectious bacteria can cause severe injuries up to and including death.

89. Rox failed to ensure its premises were clean, hygienic, and otherwise safe to Scoggins, a patient at their surgery center. Rox failed to sanitate, clean, or eradicate any harmful or deadly bacteria in its premises. As a result, thereof, Scoggins developed an infectious disease during Dubrow's surgery and came to close to death on multiple occasions.

90. Scoggins suffered damages in the amount of $10,000,000.00 as a result thereof.

## COUNT FIVE

### (Ordinary Negligence—as to Rox and E! Entertainment)

91. Plaintiff incorporates all foregoing paragraphs as if fully set forth herein.

92. Scoggin's injuries were a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendants Rox and E! Entertainment, and/or each of them.

93. Defendants owed a duty of care to Scoggins to not allow her to be placed in a situation creating an unreasonable risk of harm.

94. Rox and E! Entertainment breached said duty, as follows:

   a. allowing non-medical personnel, namely, an E! Entertainment television crew, to be present during Scoggin's operation and recovery;

   b. allowing, influencing, encouraging, or otherwise, enticing Dubrow and Dubrow's Office to rush into finishing the suturing phase of Scoggin's surgical procedure for the sole reason of filming the *Botched* television show on time; and,

   c. failing to have adequate plans or procedures in place for Scoggins with emergency post-operative procedures, when Scoggins dehisced during the filming of *Botched* by E! Entertainment.

95. As a direct and proximate result of E! Entertainment and Rox's actions and/or omissions, and prioritizing *Botched* over Scoggins's health and wellness, Scoggin's suffered serious injuries, nearly died, and continues to suffer damages in the amount of $10,000,000.00.

### IV.    JOINT AND SEVERAL LIABILITY

Defendants are equally responsible for the damages they caused. Plaintiff requests that all Defendants be held jointly and severally liable for the claims herein.

## V. VICARIOUS LIABILITY

Plaintiff alleges that at all times relevant hereto, Defendants Dubrow and Brambilla were employed with Dubrow's Office and Rox and acted within the course and scope of their employment when they committed the acts complained of. Accordingly, Dubrow's Office and Rox are vicariously liable for its agents' actions and the resulting damages. Likewise, E! Entertainment is responsible for the actions of its agents, employees, and representatives present on the day in question, more specifically, its film crew and producers.

## VI. JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable and is tendering the appropriate fee herewith to this Court's clerk.

## VII. DAMAGES

As a direct and proximate result of the occurrence that makes the basis of this lawsuit, the Plaintiff was caused to suffer severe and painful injuries and to incur the following damages:

a. Reasonable medical care and expenses in the past. These expenses were incurred by Plaintiff for the necessary care and treatment of the injuries resulting from the incident complained of herein, and such charges are reasonable and were usual and customary charges for such services;
b. Reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future;
c. Physical pain and suffering in the past;
d. Physical pain and suffering in the future;
e. Physical impairment in the past;
f. Physical impairment which, in all reasonable probability, will be suffered in the future;
g. Mental anguish in the past;
h. Mental anguish in the future;
i. Lost opportunity; and,
j. Past, present, and future lost wages.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Sandy Scoggins prays that Defendants Terry Joel Dubrow, M.D., Terry Dubrow, M.D., a Medical Corporation, Jacqueline Brambilla, Rox Surgery Center Newport Beach, LLC, and E! Entertainment Television, LLC, be cited to answer and appear herein; and that upon hearing and trial, that judgment be entered in her favor and against Defendants, jointly and severally, for compensatory damages, statutory damages, punitive and exemplary damages, attorneys fees, court costs, and pre and post-judgment interest as allowed by law, in the amount of ten million dollars ($10,000,000.00); and prays for such other and further relief, whether at law or in equity, to which she may show herself justly entitled.

Respectfully submitted,

**LE BROCQ & HORNER, PLLC**

2150 N. Josey Lane, Ste. 227
Carrollton, Texas 75006
P: (469) 930-4385 F: (866) 820-6005
S: eservice@lebrocqhorner.com

/s/ Stephen Le Brocq
Stephen Le Brocq
TSBN: 24094791
E: Stephen@lebrocqhorner.com

ATTORNEYS FOR PLAINTIFF
SANDY SCOGGINS